**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Stephanie Barnett o/b/o D.B., a minor,      :      Case No. 1:12 CV 2266
                                            :
        Plaintiff,                          :
                                            :
v.                                          :
                                            :
Commissioner of Social Security,            :      **MEMORANDUM AND**
        Defendant,                          :      **ORDER**


**I. INTRODUCTION**

Plaintiff Stephanie Barnett ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim

for Supplemental Security Income ("SSI"), filed on behalf of her minor son, D.B., under Title XVI of

the Social Security Act, 42 U.S.C. § 1381 (Docket No. 1). Pending are the parties' Briefs on the Merits

(Docket Nos. 17 and 18). For the reasons that follow, the opinion of the Commissioner is affirmed.

1

## II. PROCEDURAL BACKGROUND

On June 26, 2009, Plaintiff filed an application on behalf of her son for a period of SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 12, p. 119 of 605). Plaintiff's claims were denied initially on August 27, 2009 (Docket No. 12, p. 68 of 605), and upon reconsideration (Docket No. 12, pp. 79-81 of 605). Plaintiff thereafter filed a timely written request for a hearing on March 4, 2010 (Docket No. 12, p. 82 of 605).

On April 19, 2011, Plaintiff, along with her son D.B., appeared with counsel for a hearing before Administrative Law Judge James Dixon ("ALJ Dixon") (Docket No. 12, pp. 37-61 of 605). ALJ Dixon found D.B. to have a severe combination of asthma, borderline intellectual functioning, mixed receptive-expressive language disorder, and attention deficit hyperactivity disorder ("ADHD") with an application date of June 26, 2009 (Docket No. 12, p. 18 of 605)

Despite these limitations, ALJ Dixon determined that, based on all the evidence presented, D.B. had not been disabled within the meaning of the Social Security Act at any time from the application date through the date of his decision (Docket No. 12, p. 31 of 605). ALJ Dixon found that while D.B. suffered from a marked limitation in acquiring and using information, he suffered "less than marked" or "no" limitation in the remaining functional equivalence domains, namely: (1) attending and completing tasks; (2) interacting and relating with others; (3) moving about and manipulating objects; (4) caring for himself; and (5) health and physical well-being (Docket No. 12, pp. 24-31 of 605). Plaintiff's request on behalf of D.B. was therefore denied (Docket No. 12, p. 31 of 605).

On September 6, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of the denial of D.B.'s claim for SSI (Docket No. 1). In her pleading,

Plaintiff alleged that the ALJ erred by: (1) finding that D.B.'s intellectual impairment does not meet the criteria of Listing 112.05(D), mental retardation; and (2) failing to find "marked limitations" in more than one of the six functional equivalence domains (Docket No. 17). Defendant filed its Answer on December 13, 2012 (Docket No. 11).

### III.  FACTUAL BACKGROUND

**A.**     **THE ADMINISTRATIVE HEARING**

An administrative hearing convened on April 19, 2011, in Cleveland, Ohio (Docket No. 12, pp. 37-61 of 605). D.B., represented by Katherine Braun, appeared and testified (Docket No. 12, pp. 43-45 of 605). Also present and testifying was Plaintiff, D.B.'s mother (Docket No. 12, pp. 41-43, 45-61 of 605).

**1.**     **D.B'S TESTIMONY**

At the time of the hearing, D.B. was eight years old and in the second grade (Docket No. 12, p. 43 of 605). D.B. testified that he did not have any problems at school, was doing "good," and was earning top grades (Docket No. 12, pp. 43-44 of 605). When asked about his relationship with his siblings, D.B. stated that they do not get along because his siblings yell at him (Docket No. 12, pp. 44-45 of 605).

**2.**     **PLAINTIFF'S TESTIMONY**

At the time of the hearing, Plaintiff resided with her oldest son, age twenty, her daughter, age seventeen, her granddaughter, age one, D.B, age eight, and her fiancé (Docket No. 12, p. 52 of 605). Plaintiff indicated that she had filed four previous applications for disability on behalf of her son, but had never before made it to the administrative hearing level (Docket No. 12, pp. 45-46 of 605). When asked by the ALJ what entitles D.B. to disability, Plaintiff stated that, while her son is physically

developing normally, he is also "developing slow and learning slow" (Docket No. 12, pp. 46, 58 of 605). Plaintiff indicated that D.B. suffered from complications with asthma and ADHD (Docket No. 12, p. 46 of 605).

With regards to his asthma, Plaintiff indicated that D.B. last had to go to the hospital for an asthma attack in June or July of 2010 (Docket No. 12, p. 47 of 605). She also indicated that D.B. had missed twenty-four days of school because of asthma attacks and his subsequent need for at-home nebulizer treatments (Docket No. 12, p. 54 of 605).

Plaintiff testified that D.B. had recently been diagnosed with ADHD and indicated that D.B. has difficulty in school, often failing to bring home his homework, having behavioral issues in class, and bringing a mouse to school (Docket No. 12, pp. 47, 49-51 of 605). With regard to his home life, Plaintiff stated that D.B.

> [c]rawls around over the floor, he makes sounds, he doesn't follow directions . . . , he talks back to me, he doesn't listen, he's not able to wash himself up in the morning when he has to get ready for school . . . you have to repeat it over and over what to do. He doesn't want to clean his room up, he gets a tantrum, he goes in his brother's and sister's room and steals their personal items and say he didn't do it. He steals food at home and hides everything up in his room. And I tell him, over and over, he can't do that.
>
> He cries a lot, like a baby.

(Docket No. 12, p. 48 of 605). Plaintiff indicated that D.B. cannot wash himself or brush his teeth without supervision and has difficulty remembering what he just read (Docket No. 12, pp. 57-59 of 605).

## B.    EDUCATIONAL RECORDS

### 1.    TEACHER REPORTS

On January 9, 2008, at the request of the Bureau of Disability Determination ("BDD"), D.B.'s Pre-Kindergarten teacher, Kelly McIntyre ("Ms. McIntyre"), completed a request for information and

teacher questionnaire (Docket No. 12, pp. 147-56 of 605). Ms. McIntyre indicated that D.B. had not been assessed for special class placement and did not receive special instruction (Docket No. 12, p. 155 of 605). She was most concerned about D.B.'s social and emotional development, noting that D.B. was "starving for attention" (Docket No. 12, pp. 148, 150 of 605). Ms. McIntyre reported that D.B. had a hard time focusing for longer than ten minutes, got frustrated, and often needed more time than his classmates to regroup (Docket No. 12, pp. 149, 152 of 605). The teacher indicated that D.B.'s physical conditions did not affect his learning (Docket No. 12, p. 153 of 605).

On November 3, 2009, Kristin Towarnicke ("Ms. Towarnicke"), D.B.'s first grade teacher, also completed a request for information and teacher questionnaire at the request of the BDD (Docket No. 12, pp. 200-11 of 605). Ms. Towarnicke noted that D.B. did not receive special instruction but he did go to the school resource room for fifteen minutes each day (Docket No. 12, p. 208 of 605). It was noted that D.B. had missed nine days of school in the quarter, but Plaintiff had indicated to Ms. Towarnicke that D.B. had no asthma complications (Docket No. 12, p. 200 of 605). Ms. Towarnicke stated that when D.B. takes his ADHD medications, he "functions well" in the classroom," is "pleasant and work[s] to relate to others," and functions as a "typical student" (Docket No. 12, pp. 201-06 of 605). Ms. Towarnicke was pleased with D.B.'s progress (Docket No. 12, p. 205 of 605).

On February 4, 2011, Alexis Pohlman ("Ms. Pohlman"), D.B.'s second grade teacher, completed a teacher questionnaire (Docket No. 12, pp. 309-12 of 605). Ms. Pohlman reported that D.B. was in a regular education classroom but was being evaluated for special education placement (Docket No. 12, p. 309 of 605). D.B. had missed twenty-four of the past one hundred days of school (Docket No. 12, p. 310 of 605). Ms. Pohlman noted that D.B. was limited in reading, writing, and math, and rarely finished an activity alone (Docket No. 12, p. 310 of 605). D.B. was always given

5

extra assistance, instruction, and time to complete tasks (Docket No. 12, p. 310 of 605). Ms. Pohlman also reported that D.B.'s classroom behavior could be very disruptive, including excessive talking and noises (Docket No. 12, p. 312 of 605). Ms. Pohlman suggested that D.B.'s behaviors were done in an attempt to get her attention (Docket No. 12, p. 312 of 605).

### 2.    EVALUATION TEAM REPORT

On March 3, 2011, a team of teachers, including Ms. Pohlman, school district representatives, and school psychologists, conducted a multi-factored evaluation of D.B.'s academic performance and need for special education (Docket No. 12, pp. 268-304 of 605). D.B.'s scores are summarized as follows:

| Category | Range/Grade Level |
|---|---|
| Reading/Letter Word Identification | 2.3 grade level  (average) |
| Reading/Comprehension | low average range |
| Math Calculation | 2.3 grade level (average) |
| Math/Applied Problems | borderline ninth month of kindergarten level |
| Writing/Spelling | 2.2 grade level (average) |
| Writing/Writing Samples | 1.2 grade level (below average) |

(Docket No. 12, pp. 273-74 of 605). Based on these scores, the team determined that D.B. would not be able to transition to a regular third grade classroom and would instead require intensive specialized instruction and a modified curriculum (Docket No. 12, p. 274 of 605).

In addition to these educational needs, the team reported that D.B.'s classroom behavior was very disruptive (Docket No. 12, p. 279 of 605). He was rarely able to work independently, did not complete most assignments, and had difficulty focusing on lessons (Docket No. 12, p. 279 of 605). The report also indicated that D.B. sought attention through his behavior (Docket No. 12, p. 279 of 605). The team suggested that D.B. needed to increase his receptive and expressive vocabulary (Docket No.

6

12, p. 282 of 605).

With regard to D.B.'s social and emotional status, the evaluation team drew the following conclusions:

| Category | Range |
|---|---|
| Total Problems/Externalizing Score | borderline clinical range |
| Internalizing | normal range |
| Attention Problems/Rule Breaking | borderline clinical range |
| Inattention/Hyperactivity/Impulsivity | high enough to warrant concern |
| Affective/Anxiety/Somatic/Oppositional Defiant/Conduct Problems | normal |
| ADHD Problems | borderline clinical range |

(Docket No. 12, p. 280 of 605).

C.    MEDICAL RECORDS

    1.    ASTHMA AND ADHD

D.B. was born on October 6, 2002 (Docket No. 12, p. 1 of 605). By December 2003, he had been diagnosed with infant asthma (Docket No. 12, pp. 349, 375 of 605). Medical records from July 2008 indicate that D.B. had been hospitalized for his asthma four to five times (Docket No. 12, p. 443 of 605). On April 8, 2009, D.B. was diagnosed with ADHD (Docket No. 12, p. 522 of 605). D.B. takes medication for both his asthma and ADHD (Docket No. 12, pp. 255, 522 of 605).

    2.    PSYCHOLOGICAL TESTING

On January 22, 2008, D.B. underwent a disability assessment with Dr. Deborah Koricke, Ph.D ("Dr. Koricke") (Docket No. 12, pp. 424-28 of 605). D.B. obtained a full-scale IQ score of seventy-six (Docket No. 12, p. 424 of 605). Dr. Koricke also noted that D.B. had a borderline range of ability in both sensorium and cognitive functioning, exhibiting: (1) difficulty in understanding and

7

comprehending instructions; (2) developmental and socially immature traits with concrete and simplistic thoughts; (3) difficulty tracking a conversation between others; and (4) a limited capacity for speech (Docket No. 12, pp. 426-27 of 605). However, D.B. was very cooperative and motivated during the evaluation, showed no difficulty relating to others, and displayed no evidence of attention deficits (Docket No. 12, pp. 426-27 of 605). Based on her observations and test results, Dr. Koricke diagnosed D.B. with mixed receptive-expressive language disorder, borderline intellectual functioning, and assigned him a Global Assessment of Functioning score of forty-five (Docket No. 12, p. 426 of 605).[1] Dr. Koricke opined that D.B. would have difficulty in understanding directives and with both daily and complex tasks, requiring supervision and instruction to perform even simple tasks (Docket No. 12, p. 428 of 605).

Dr. Koricke completed another disability assessment of D.B. on December 3, 2009 (Docket No. 12, pp. 534-39 of 605). This time, D.B. obtained a full-scale IQ score of seventy-five (Docket No. 12, p. 534 of 605). Again D.B. displayed borderline sensorim and cognitive functioning (Docket No. 12, p. 537 of 605). Dr. Koricke diagnosed D.B. with mixed receptive-expressive language disorder, ADHD, and borderline intellectual functioning (Docket No. 12, p. 538 of 605). She assigned D.B. a GAF score of fifty-five (Docket No. 12, p. 538 of 605).[2]

---

[1] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of 45 indicates serious symptoms or any serious impairment in social, occupation, or school functioning THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

[2] Dr. Koricke's report initially states that she assigned D.B. a GAF score of 45 (Docket No. 12, p. 538 of 605). However, later in that report, Dr. Koricke twice states that D.B. has a GAF score of 55 and makes reference to a "moderate level of symptoms" (Docket No. 12, p. 539 of 605). A GAF score of 55 indicates moderate symptoms or moderate difficulty in social, occupation, or school functioning. DSM-IV, 34.

3.    SPEECH LANGUAGE EVALUATIONS

On May 19, 2008, D.B. underwent a speech-language evaluation with speech pathologist Debbie Radovic ("Ms. Radovic") (Docket No. 12, pp. 431-37 of 605). This evaluation revealed D.B.'s severely disordered receptive and expressive language skills (Docket No. 12, p. 433 of 605). Ms. Radovic recommended therapy one time per week for thirty minute sessions (Docket No. 12, p. 433 of 605). Given this therapy, D.B.'s prognosis was good (Docket No. 12, p. 433 of 605).

D.B. underwent a second speech-language evaluation on December 15, 2009, with clinician Justine Leshikar, M.S. CCC-SLP ("Ms. Leshikar") (Docket No. 12, pp. 541-43 of 605). Again D.B. demonstrated a severe mixed receptive-expressive language disorder (Docket No. 12, p. 542 of 605). Ms. Leshikar recommended individual speech-language therapy one time per week for thirty-minute sessions for a minimum of six months (Docket No. 12, p. 542 of 605).

4.    CHILDHOOD DISABILITY EVALUATIONS

D.B. underwent his first Childhood Disability Evaluation on June 3, 2008, with state examiner Karen Carver, M.A., CCC-SLP ("Ms. Carver") (Docket No. 12, pp. 445-50 of 605). Of the six functional areas evaluated, Ms. Carver found that D.B. suffered: (1) marked limitation in acquiring and using information; (2) no limitation in attending to and completing tasks or manipulating objects; and (3) less than marked limitation in interacting with and relating to others, caring for himself, and health and physical well-being (Docket No. 12, pp. 447-48 of 605). Based on these results, Ms. Carver found that D.B.'s impairment or combination of impairments was severe but did not meet or medically or functionally equal the listings (Docket No. 12, p. 445 of 605).

D.B. returned to Ms. Carver for a second evaluation on July 29, 2009 (Docket No. 12, pp. 523-28 of 605). The results were identical to those of the June 2008 evaluation, except that Ms. Carver

found that D.B. had less than marked limitations in attending to and completing tasks (Docket No. 12, p. 525 of 605). Again Ms. Carver concluded that D.B.'s impairment or combination of impairments was severe but did not meet or medically or functionally equal the listings (Docket No. 12, p. 523 of 605).

D.B. underwent a final Childhood Disability Evaluation on January 5, 2010, with state examiner Melissa Hall, MA ("Ms. Hall") (Docket No. 12, pp. 544-49 of 605). D.B.'s results were identical to those found by Ms. Carver in July 2009 (Docket No. 12, pp. 546-47 of 605). Ms. Hall concluded that D.B.'s impairment or combination of impairments was severe but did not meet or medically or functionally equal the listings (Docket No. 12, p. 544 of 605).

## IV. STANDARD OF DISABILITY

An individual under the age of eighteen (18) shall be considered disabled "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 1382(c)(3)(C)(i). The Commissioner employs a three-step sequential evaluation process to determine whether an individual under the age of eighteen (18) is disabled. 20 C.F.R. § 416.924. Specifically, the Commissioner will consider: (1) whether the child is engaged in substantial gainful activity; (2) whether the child has a medically determinable severe impairment which is expected to result in death, has lasted or is expected to last for a continuous period of not less than twelve months and, if so; (3) whether the impairment or combination of impairments meets, medically equals, or functionally equals the severity of any impairment listed in the listing found at 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(a)-(d).

10

To "functionally equal" a listing, the Commissioner must find that the child has either an extreme limitation in one area of functioning, or a marked limitation in two areas of functioning. 20 C.F.R. § 416.926a(a). These areas of functioning are as follows: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). In making a determination, the Commissioner will consider numerous relevant factors including, but not limited to: (1) how well the child can initiate and sustain activities, how much extra help he needs, and the effects of structure or supportive settings; (2) how the child functions in school; and (3) the effects of the child's medications and other treatments. 20 C.F.R. § 416.926a(a)(1)-(3). These findings will be compared to the performance of other children of the same age who do not have impairments. 20 C.F.R. § 416.926a(b).

A child has a "marked" limitation when the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'" 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation may seriously limit day-to-day functioning. 20 C.F.R. § 416.926a(e)(3)(I).

### V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Dixon made the following findings:

1.  D.B. was born on October 6, 2002. Therefore, he was a school-age child on June 26, 2009, the date the application was filed, and is currently a school-age child.

2.  D.B. has not engaged in substantial gainful activity since June 26, 2009, the

11

application date.

3.     D.B. has the following severe impairments: asthma, borderline intellectual functioning, mixed receptive-expressive language disorder, and ADHD.

4.     D.B. does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.     D.B. does not have an impairment or combination of impairments that functionally equals the listings.

6.     D.B. has not been disabled, as defined in the Social Security Act, since June 26, 2009, the date the application was filed.

(Docket No. 12, pp. 15-31 of 605). ALJ Dixon denied Plaintiff's request for SSI benefits (Docket No. 12, p. 31 of 605).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because

12

there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A. PLAINTIFF'S ALLEGATIONS

In her Brief on the Merits, Plaintiff, on behalf of D.B., alleges that the ALJ erred in finding: (1) that D.B.'s intellectual impairment does not meet the criteria of Listing 112.05(D), mental retardation; and (2) "marked limitations" in only one of the six functional equivalence domains (Docket No. 17).

### B. DEFENDANT'S RESPONSE

Defendant contends that the ALJ's decision properly accounts for all of D.B.'s established severe impairments (Docket No. 18, pp. 12-13 of 18). Furthermore, Defendant argues that the ALJ's assessment of the severity of D.B.'s established impairments was based on substantial evidence contained in the record (Docket No. 18, pp. 14-16 of 18).

### C. DISCUSSION

#### 1. SEVERE IMPAIRMENTS: MENTAL RETARDATION

Plaintiff first argues that the ALJ failed to find that D.B.'s intellectual impairment meets the criteria of Listing 112.05(D), mental retardation (Docket No. 17, pp. 10-14 of 21). Under the Listings, mental retardation is "characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 112.05. To meet the level of severity required by this listing, a claimant must satisfy at least one of six possible options. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 112.05. In this case, Plaintiff argues that D.B. meets option (D), which finds mental retardation when there is "[a] valid verbal, performance, or full

scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 112.05(D).

Here, there is no doubt that D.B. received a verbal comprehension score between sixty and seventy. During a December 2009 intelligence test, Dr. Koricke assigned D.B. the following scores:

| Scale | Composite Score |
| --- | --- |
| Verbal Comprehension Index | 65 |
| Perceptual Reasoning Index | 92 |
| Working Memory Index | 74 |
| Processing Speed Index | 91 |
| Full Scale | 75 |

(Docket No. 12, p. 534 of 605). However, Plaintiff's argument that D.B.'s asthma and ADHD satisfy the Listing's second criteria in that they impose "an additional and significant limitation of function," is without merit.

D.B. was diagnosed with infant asthma on December 19, 2003, at the age of fourteen months (Docket No. 12, pp. 350, 376 of 605). In July 2008, Dr. Liang described D.B.'s asthma as mild and persistent (Docket No. 12, p. 444 of 605). Medical records from March 2009 indicate that D.B. was undergoing treatment for his asthma, using both Singulair and Albuterol (Docket No. 12, p. 255 of 605). On May 11, 2009, D.B. was admitted to the hospital from the Emergency Room because he was having difficulty breathing (Docket No. 12, p. 494 of 605). D.B. was discharged on May 13, 2009, after successful treatment and it was noted that he had poor compliance with his asthma medication (Docket No. 12, pp. 569-70 of 605).

Plaintiff testified that D.B. has to miss multiple days of school to undergo at-home nebulizer treatments for his asthma flares (Docket No. 12, pp. 54-57 of 605). However, Ms. Towarnicke observed no impact on D.B's schooling as a result of these absences (Docket No. 12, p. 206 of 605).

14

Ms. Pohlman noted that, while D.B. had missed twenty-four out of the past one hundred days of school, only three of those days were for asthma-related issues (Docket No. 12, p. 310 of 605).

D.B. was also diagnosed with ADHD on April 8, 2009 (Docket No. 12, p. 522 of 605). Although D.B.'s teachers noted his difficulty with focusing on a task (Docket No. 12, p. 310 of 605), paying attention (Docket No. 12, p. 202 of 605), and carrying out instructions (Docket No. 12, p. 202 of 605), they also reported that D.B. functioned as a "typical student" when on his ADHD medication (Docket No. 12, p. 206 of 605) and often just sought attention through his disruptive behavior (Docket No. 12, pp. 150, 312 of 605). During a January 2008 Disability Assessment, Dr. Koricke found no evidence of D.B.'s attention deficits and noted that D.B. was cooperative and motivated (Docket No. 12, p. 427 of 605). During her second assessment in December 2009, Dr. Koricke noted that D.B. showed no signs of anxiety and described him as being "calm and relaxed" (Docket No. 12, p. 537 of 605).

Given this evidence, it is clear that while D.B. suffers from both asthma and ADHD, these impairments do not impose any signficiant level of limitation upon his functioning. Without this finding, D.B. fails to meet all the requirements of Listing 112.05(D).

It should be noted that Plaintiff also argues that D.B. suffers from deficits in adaptive functioning, a criteria listed in the introductory paragraph of Listing 112.05 (Docket No. 17, pp. 13-14 of 21). While this may be true, Plaintiff's argument is of no consequence. Section 112.05 states that "[t]he required level of severity for [mental retardation] is met when the requirements in A, B, C, D, or E are satisfied." Plaintiff alleges that D.B. should be found mentally retarded based on his satisfaction of 112.05(D) (Docket No. 17, pp. 10-14 of 21). As stated above, D.B. fails to satisfy the requirements of 112.05(D). Whether or not D.B. satisfies the introductory criteria is of no consequence when he

15

cannot satisfy the remaining elements of the regulation. Therefore, Plaintiff's first assignment of error is without merit and the decision of the Commissioner is affirmed.

### 2.    FUNCTIONAL EQUIVALENCE

Plaintiff next argues that the ALJ erred by failing to find that D.B.'s severe impairments did not "functionally equal" a listing (Docket No. 17, pp. 14-21 of 21). In order to receive a finding of disabled, a child claimant must have a "medically determinable severe impairment" which meets, medically equals, or *functionally* equals the severity of a listed impairment. 20 C.F.R. § 416.924(a)-(d) (emphasis added). To "functionally equal" the Listings, a child claimant's impairment or combination of impairments must result in "marked" limitations in two domains or "extreme" limitations in one domain. 20 C.F.R. § 416.926a(d). Plaintiff alleges that D.B. has marked limitations in the following domains: (1) attending and completing tasks; (2) interacting and relating with others; and (3) health and physical well-being (Docket No. 17, pp. 14-21 of 21). Plaintiff's argument is without merit.

ALJ Dixon discussed in detail D.B.'s limitations caused by his severe impairments (Docket No. 12, pp. 24-30 of 605). It is clear from the evidence presented that D.B. suffers from a marked limitation in the area of acquiring and using information (Docket No. 12, p. 24 of 605). By the ALJ's own admission, D.B. suffers from a borderline range of intellectual functioning (Docket No. 12, p. 18 of 605). On two separate occasions, Dr. Koricke found that D.B. suffered from a borderline range of ability in sensorim and cognitive functioning (Docket No. 12, pp. 426, 537 of 605). Dr. Koricke described D.B. as having "difficulty in understanding or comprehending instructions," and noted that he was "developmentally and socially immature with concrete and simplistic thought content" (Docket No. 12, pp. 426, 537 of 605). D.B's second grade teacher, Ms. Pohlman, noted that D.B. suffers from limitations in reading, writing, and math, and always requires extra assistance, instructions, and time to

16

complete assignments (Docket No. 12, p. 310 of 605). A March 2011 Evaluation Team Report, as well as state agency examinations, confirmed this assessment (Docket No. 12, pp. 274, 447, 525, 546 of 605).

However, D.B. shows no evidence of "marked" or "extreme" limitations in any other functionally assessed category. ALJ Dixon found D.B. had "less than marked" limitation in: (1) attending and completing tasks; (2) interacting and relating with others; (3) caring for himself; and (4) health and physical well-being (Docket No. 12, pp. 25-31 of 605).

### a. ATTENDING AND COMPLETING TASKS

ALJ Dixon found that D.B. had "less than marked" limitations with regard to attending and completing tasks (Docket No. 12, pp. 25-26 of 605). This domain considers how well a child is able to focus and maintain attention, how well the child begins, carries through, and finishes his activities, including the pace at which the child performs activities and the ease with which he changes them. 20 C.F.R. § 416.926a(h).

Ms. Towarnicke, D.B.'s first grade teacher, noted that D.B. had some difficulty in changing from one activity to another without being disruptive and in working without distracting himself or others (Docket No. 12, p. 202 of 605). She also noted difficulties in D.B.'s ability to pay attention, focus, and complete tasks (Docket No. 12, p. 202 of 605). However, Ms. Towarnicke also reported that D.B. functioned as a "typical student" when he took his ADHD medications (Docket No. 12, p. 206 of 605).

Ms. Pohlman, D.B.' second grade teacher, reported similar findings. Ms. Pohlman reported that D.B. had difficulty paying attention and focusing, and, as a result, was always given extra assistance, instructions, and time to complete tasks (Docket No. 12, p. 310 of 605). She also noted that D.B. could

17

have disruptive classroom behaviors such as excessive talking out and noise-making (Docket No. 12, p. 312 of 605). However, Ms. Pohlman also reported that D.B.'s behaviors seemed to be done in an effort to gain her attention (Docket No. 12, p. 312 of 605). During the Evaluation Team Report, school psychologist Karen Slygh ("Ms. Slygh") reported that D.B. had trouble focusing on lessons and sought out attention for his negative behaviors (Docket No. 12, p. 279 of 605). Ms. Slygh concluded that D.B.'s behaviors were secondary to his diagnosis of ADHD, noting that D.B. worked well one-on-one (Docket No. 12, pp. 279, 299 of 605). Based on this evidence contained in the record, ALJ correctly concluded that, when properly medicated, D.B. is capable of functioning as a normal child. Therefore, D.B. has less than marked limitations in this category.

### b.   INTERACTING AND RELATING WITH OTHERS

The ALJ similarly reasoned that D.B. has "less than marked" limitations with regard to interacting with and relating to others (Docket No. 12, pp. 26-27 of 605). This domain considers how well a child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i).

When asked, D.B. stated that he did not get along well with his siblings (Docket No. 12, p. 44 of 605). However, Plaintiff stated that D.B. gets along with other children "pretty good" (Docket No. 12, p. 58 of 605). Ms. Towarnicke noted that D.B., when medicated, is "pleasant and work[s] well to relate with others" (Docket No. 12, p. 203 of 605). Ms. Pohlman noted that D.B. is capable of working with others and always returns borrowed items back to where they belong (Docket No. 12, p. 311 of 605). During both Disability Assessments, Dr. Koricke noted that D.B. displayed no difficulty in relating to others (Docket No. 12, pp. 426, 538 of 605). Dr. Koricke also noted that D.B. was friendly

18

and smiled continually (Docket No. 12, p. 427 of 605). Although two speech-language pathologists recommended some speech therapy for D.B., they both noted that D.B.'s speech was intelligible and he was able to communicate his wants and needs (Docket No. 12, pp. 432, 543 of 605). Based on this evidence, the ALJ properly concluded that D.B. suffered from only "less than marked" limitations in interacting and relating with others.

### c.    CARING FOR HIMSELF

ALJ Dixon also concluded that D.B. has "less than marked" limitations with regard to caring for himself (Docket No. 12, pp. 28-29 of 605). In this domain, the Commissioner considers how well a child maintains a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways. 20 C.F.R. § 416.926a(k). This domain also considers how a child copes with stress and changes in his environment and whether he takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k).

Plaintiff's testimony was particularly negative in this category. Plaintiff stated that she has to continually remind D.B. to wash himself and brush his teeth (Docket No. 12, pp. 48, 57-58 of 605). Plaintiff also testified that D.B. does not clean his room and hides food and dishes under the bed (Docket No. 12, p. 59 of 605). However, during both Disability Assessments, Dr. Koricke noted that D.B. appeared clean and neat, and presented with a good appearance (Docket No. 12, pp. 427, 536 of 605). Ms. Towarnicke noted that D.B. was making improvements in controlling his emotions and responding appropriately to changes in his own mood (Docket No. 12, p. 205 of 605). Ms. Pohlman noted that D.B.'s ability to cope with school stress and environment changes was normal (Docket No. 12, p. 311 of 605). Based on this evidence, the ALJ was correct in concluding that D.B. had "less than marked" limitations in this area.

### d.     HEALTH AND PHYSICAL WELL-BEING

ALJ Dixon also concluded that D.B. had "less than marked" limitations in the area of health and physical well-being (Docket No. 12, pp. 29-31 of 605). This domain analyzes the "cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [a child's] functioning" that were not previously considered. 20 C.F.R. § 416.926a(l).

D.B. has been treated for asthma since he was an infant (Docket No. 12, pp. 350, 376 of 605). This asthma sometimes required D.B. to miss school in order to undergo at-home nebulizer treatments (Docket No. 12, pp. 54-57 of 605). Despite missing school, Ms. Pohlman observed no physical limitations (Docket No. 12, p. 311 of 605). In July 2008, Dr. Liang reported that D.B. had only mild persistent asthma (Docket No. 12, p. 444 of 605). In May 2009, D.B. was admitted to the hospital for his asthma (Docket No. 12, p. 494 of 605). His hospital stay was short, lasting only two days, and his condition improved with treatment (Docket No. 12, p. 569 of 605). Hospital notes indicate that D.B. had "poor compliance" with his asthma medications (Docket No. 12, p. 569 of 605). Based on this evidence, it appears that D.B.'s asthma is under control with proper medication and when he is *compliant* with those medications. Therefore, D.B. has only "less than marked" limitations with regard to health and well-being.

### e.     MOVING ABOUT AND MANIPULATING OBJECTS

Finally, the evidence clearly supports ALJ Dixon's finding that D.B. has no limitation with regard to moving about and manipulating objects (Docket No. 12, pp. 27-28 of 605). This domain assesses how a child moves his body from one place to another and how he moves and manipulates things. 20 C.F.R. § 416.926a(j).

During all three of D.B.'s Childhood Disability Evaluations, neither Ms. Carver nor Ms. Hall

found any limitation in this category (Docket No. 12, pp. 448, 526, 547 of 605). Ms. Towarnicke's and Ms. Pohlman's observations yielded similar results (Docket No. 12, pp. 204, 311 of 605). The Evaluation Team Report found that D.B's fine and gross motor skills were within an average range (Docket No. 12, pp. 277-78 of 605). Therefore, the Magistrate finds substantial evidence to support ALJ Dixon's findings in this category.

Based on a review of the complete record, the Magistrate finds that ALJ Dixon based his limitation findings on substantial evidence contained within the record. Therefore, Plaintiff's second assignment of error is without merit and the decision of the Commissioner is affirmed.

## VIII. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is affirmed.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:  May 23, 2013